# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**ANGELA DAWN MOSES,**

     **Plaintiff,**

**v.**                                        **Case No.: 3:16-cv-06581**

**NANCY A. BERRYHILL,[1]**
**Acting Commissioner of the Social**
**Security Administration,**

     **Defendant.**

### <u>MEMORANDUM OPINION</u>

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently before the Court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 7, 8). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

---

[1] Pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the current Acting Commissioner of the Social Security Administration, Nancy A. Berryhill, is substituted for former Acting Commissioner Carolyn W. Colvin as Defendant in this action.

# I. __Procedural History__

Plaintiff, Angela Dawn Moses (hereinafter referred to as "Claimant"), completed an application for SSI benefits on August 7, 2012, alleging a disability onset of December 12, 2004[2] due to "Psychological problems, back lumbar problems, ibs [IBS-Irritable Bowel Syndrome], vision, back injury, depression, anxiety, migraines, knee problems, shoulder problems, hands, [and] allergies." (Tr. at 216). The Social Security Administration ("SSA") denied the application initially and upon reconsideration. (Tr. at 11). On May 23, 2013, Claimant filed a written request for an administrative hearing, which was held on November 10, 2014 before the Honorable Maria Hodges, Administrative Law Judge ("ALJ"). (Tr. at 31-64). By decision dated November 20, 2014, the ALJ determined that Claimant was not entitled to benefits.[3] (Tr. at 11-25).

The ALJ's decision became the final decision of the Commissioner on May 20, 2016, when the Appeals Council denied Claimant's request for review. (Tr. at 1–3). On July 21, 2016, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Proceedings. (ECF Nos. 9, 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings, each requesting relief on her behalf. Consequently, this matter is fully briefed and ready for resolution.

---

[2] At the administrative hearing held on November 10, 2014, Claimant amended her onset date of disability to August 7, 2012, the date of her application. (Tr. at 37).

[3] Claimant previously filed for DIB and SSI benefits on December 7, 2006, which were denied initially and upon reconsideration on April 5, 2007 and September 26, 2007, respectively. Claimant received an unfavorable decision from ALJ Rosanne Dummer ("ALJ Dummer") on August 6, 2009, which was subsequently affirmed by the Appeals council on August 26, 2010, and by U.S. District Court on January 5, 2011. (Tr. at 11).

## II.     Claimant's Background

Claimant was 35 years old at the time of the administrative hearing and the ALJ's decision. (Tr. at 36). She has at least high school education and is able to communicate in English. (Tr. at 36, 215, 217). Claimant previously worked as a home health caregiver, cleaner, restaurant worker, and cashier. (Tr. at 38-42, 218).

## III.    Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving disability, defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A). The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her

impairments. *Id.* § 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to establish, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of

decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 416.920a(e)(4).

In this case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since August 7, 2012. (Tr. at 13-14, Finding No. 1). Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of obesity, degenerative disc disease, Irritable Bowel Syndrome (IBS), Bipolar Disorder, Anxiety-related Disorder, and Alcohol Abuse in remission." (Tr. at 14-15, Finding No. 2). However, the ALJ found that Claimant's impairments of endometriosis, polycystic ovarian syndrome, diabetes mellitus, hypertension, headaches, and vision issues were non-severe. (Tr. at 14-16).

At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any impairment contained in the Listing. (Tr. at 16-19, Finding No. 3). Consequently, the ALJ determined that Claimant had the RFC to:

> [P]erform medium work as defined in 20 CFR 416.967(c) except should never climb ladders, ropes, or scaffolds; can frequently climb ramps/stairs, balance, stoop, kneel or crouch; occasionally crawl; should avoid concentrated exposure to temperature extremes, hazards, and vibration; is limited to understanding, remembering and carrying out simple instructions in a work setting involving occasional interaction with others; and low-stress work, defined as no fast-paced production rate or strict time limits.

(Tr. at 19-23, Finding No. 4). Based upon the RFC assessment, the ALJ determined at the fourth step that Claimant was unable to perform her past relevant work. (Tr. at 23, Finding No. 5). Under the fifth and final inquiry, the ALJ reviewed Claimant's prior work experience, age, and education in combination with her RFC to determine if she would be able to engage in substantial gainful activity. (Tr. at 24, Finding Nos. 6-8). The ALJ considered that (1) Claimant was born in 1979 and was defined as a younger individual; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because using the Medical-Vocational Rules supported a finding that the Claimant is "not disabled," whether or not the Claimant had transferable job skills. (*Id.*). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. at 24-25, Finding No. 9). At the light level, Claimant could work as a garment bagger or hotel maid; and at the medium level, Claimant could work as a laundry worker or night cleaner and at the sedentary level, Claimant could work

as an inspector or assembler. (*Id.*). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act. (Tr. at 25 Finding No. 10).

## IV.     **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts two challenges to the Commissioner's decision. First, she claims that the ALJ failed to consider the combined effect of Claimant's impairments when determining her RFC. (ECF No. 11 at 4-6). As part of this challenge, Claimant argues that the ALJ erred by finding that Claimant's statements regarding the severity and persistence of her pain, fatigue, and other symptoms were not fully credible. (*Id.* at 6). According to Claimant, her statements and the objective evidence are mutually supportive of a finding of disability under the Social Security Act; therefore, the statements are entitled to full credibility. Second, Claimant contends that the ALJ's RFC finding is not supported by substantial evidence, because the ALJ's discussion is internally inconsistent. Specifically, Claimant points to the summary RFC finding set forth on page 19 of the transcript, which indicates that Claimant is capable of less than a full range of *medium* level work, and compares it to a statement in the associated discussion at page 21, which states that Claimant is restricted "to a reduced range of *light* work." (Tr. at 21) (emphasis added). Claimant argues that both statements cannot be correct and questions which RFC finding was intended by the ALJ.

In response to Claimant's criticisms, the Commissioner asserts that the ALJ clearly considered all of Claimant's impairments when analyzing her RFC. (ECF No. 12 at 9-12). The Commissioner argues that the ALJ's comprehensive RFC discussion included an analysis of all of Claimant's functional limitations that were established by the record, and also accounted for all of those limitations in the RFC finding. The Commissioner rejects Claimant's credibility argument, emphasizing that the ALJ

provided multiple reasons for discounting the severity of symptoms described by Claimant. (*Id.* at 10). With respect to Claimant's argument regarding the internal inconsistency of the RFC discussion, the Commissioner apparently misunderstood the argument, because she failed to directly address the discrepancy between the two exertional findings in the RFC section of the written decision. Instead, the Commissioner discusses all of the evidence that supports the ALJ's determination that Claimant could perform a reduced range of medium level work. (*Id.* at 11-13).

## V.     Scope of Review

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner

that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

## VI.     Relevant Medical Records

The Court has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute.

### A.  *Treatment Records*

On April 28, 2011, Claimant was examined by Ricardo Roa, M.D., in preparation for nasal septoplasty, endoscopy, tonsillectomy, and adenoidectomy. (Tr. at 302-04). Claimant's current medical issues included adenoid hypertrophy, benign neoplasm of the soft palate, deviated nasal septum, hypertrophied nasal turbinate, sinusitis, and tonsillar hypertrophy. Her past medical history included arthritis, depression with anxiety, otitis media, and sinusitis. Claimant presented with normal mood and affect. A CT scan of the sinuses taken on March 21 revealed minimal mucosal thickening of the right maxillary and left sphenoid air cells with minimal leftward deviation of the nasal septum. A CT scan of the neck showed a subtle polypoid nodule projecting from the soft palate just to the right of the midline that might represent a superficial mucosal inclusion cyst. There appeared a possible cementoma near the first maxillary molar. The surgery was performed on May 4, 2011. (Tr. at 298-300). The post-operative diagnosis included lesion of the palate, chronic tonsillitis, adenotonsillar hypertrophy, chronic sinusitis, nasal obstruction, nasal septal deviation, bilateral inferior turbinate hypertrophy, and failure of medical management.

On August 25, 2011, Claimant presented to her primary care physician, Daniel Whitmore, D.O., with complaints of fatigue and persistent low back pain for the past two to three years. (Tr. at 410). Claimant reported that she took Tylenol and Motrin for pain, and they provided some relief. On examination, Claimant weighed two hundred twenty-nine pounds with a blood pressure of 127/84. Claimant was alert and had an appropriate mood. Her physical examination was otherwise unremarkable, except for some pain elicited on palpation of her dorsolumbar spine and paraspinal muscles. She did not have evidence of scoliosis, and her straight leg raise was negative. Claimant was assessed with lumbago and was told to lose weight. She was also assessed with fatigue due to weight gain and depression, although Dr. Whitmore felt Claimant's depression was under control with Celexa and hydroxyzine. Dr. Whitmore ordered x-rays of Claimant's thoracic and lumbar spine that were performed on August 29, 2011. (Tr. at 421). The thoracic spine x-ray demonstrated normal spinal alignment with no evidence of acute fracture and well-preserved vertebral body heights and disc spaces. The lumbar spine x-ray showed Grade I anterolisthesis of the L5-S1, secondary to bilateral pars defects; however, no acute fracture was seen.

Claimant returned to Dr. Whitmore on September 22, 2011 informing him that she had undergone physical therapy and chiropractic care for back pain that gave her very little relief. Nonetheless, Claimant advised Dr. Whitmore that she was no longer having back pain. (Tr. at 409). Claimant was assessed with resolved back pain and encouraged to lose weight and go for daily walks.

The following month, on October 27, 2011, Claimant presented to Robert Lowe, M.D., with complaints of pain from her "neck to her tail," causing her legs to give out and go numb.(Tr. at 369-71). Claimant described the back pain as radiating into the

neck area, bilateral hips and legs along with numbness and tingling in the arms, legs, and feet. She also complained of bowel and bladder issues, as well as urinary tract infections. Claimant reported having ongoing back pain for several years that began when she injured her back lifting a 15-pound bucket at work. Claimant denied dizziness, abdominal pain, blurred vision, or bleeding. A review of systems was determined to be within normal limits.

On examination, Claimant measured five feet, seven inches in height and weighed two hundred twenty-eight pounds. She was pale and walked with a limp, but could bear weight equally. Claimant flexed forward eighty degrees and could lateral bend twenty-five degrees; however, her extension was stiff. Her reflexes appeared intact at the knees and ankles, and her toe extensors were strong. Straight leg raise while seated measured ninety degrees bilaterally, and while supine, measured eighty degrees bilaterally. Sensation appeared less in the right leg; however, there was no dermatome pattern. Dr. Lowe thought he would find a stocking pattern, which he did, but to a lesser degree. There were no real trigger points located in Claimant's back. Her thigh and calve circumferences were symmetrical. Dr. Lowe opined that Claimant had L5-S1 25% spondylolisthesis. Although Dr. Lowe could not visualize this on plain x-rays, he observed that Claimant moved at L5-S1 and the disc heights were subtly increased in height, which was compatible with a potential mal-absorption syndrome that could explain her head to toe pain. Claimant was diagnosed with spondylolisthesis and low back pain. For treatment, Dr. Lowe prescribed a lumbosacral support brace, as he did not elicit any physical findings that warranted surgical intervention. Dr. Lowe felt a positive Knudsen sign at L5-S1 with disc degeneration and narrowing of the disc might also be a source of the back pain. Dr. Lowe did not believe Claimant's back pain

would be altered by more conditioning; however, he would consider physical therapy for Claimant in the future.

Claimant returned to Dr. Lowe on November 17, 2011. (Tr. at 367-68). Laboratory reports revealed that Claimant had a low level of Vitamin D. Claimant continued to complain of constant neck and back pain causing her legs to give out and go numb. Claimant also reported bowel issues; however, she had never received medical treatment for this, and a review of systems was negative for abdominal pain, nausea, or vomiting. Claimant's gastrointestinal system was noted to be within normal limits. Her physical examination was also normal. Claimant was prescribed Vitamin D and instructed to return in six months.

Claimant presented to Sanjay Masilamani, M.D., on December 5, 2011 with complaints of anxiety and depression. (Tr. at 391-96). Claimant reported that her psychological symptoms began in her twenties and were related to family issues. She had never seen a psychiatrist, but she had previously received counseling. Claimant began drinking alcohol in her teens, causing her to build up a tolerance; however, Claimant reported that she no longer drank alcohol and had not done so for over three years. Claimant described her symptoms as mania, not being able to sleep, elevated energy, racing thoughts, irritability, fatigue, muscle aches, and agoraphobia. Claimant was being prescribed Celexa and hydroxyzine, noting these medications were helpful, but her insurance no longer covered them. On examination, Claimant was cooperative with good eye contact, normal speech, and no evidence of psychomotor agitation. She showed logical and coherent thought processes. Her affect appeared restricted; her mood was irritable and depressed; and her judgment and insight were limited. Claimant was assessed with bipolar disorder, type 1; generalized anxiety disorder; full,

sustained remission of alcohol abuse; and agoraphobia without history of panic disorder. Dr. Masilamani felt that borderline intellectual functioning versus mental retardation should also be ruled out. He gave Claimant a Global Assessment of Functioning ("GAF") score of 65-70.[4] He documented that Claimant was having a difficult time dealing with the loss of family members, but she was not suicidal at the time. Dr. Masilamani talked to Claimant about following up with a therapist in addition to providing her with a prescription for Lamictal. Claimant was advised to return in one month.

Claimant presented to Dr. Masilamani on January 16, 2012 reporting no side effects from her medication. Since increasing her dosage of Lamictal, her irritability had slightly improved. (Tr. at 389-90). Dr. Masilamani recorded that Claimant was wearing a back brace, was cooperative, and showed no sign of psychomotor agitation. However, her mood was "jumpy" and her affect was slightly restricted. Claimant did say she had met with a therapist, Jessica Williams, and felt it was very helpful. Claimant demonstrated normal speech, logical thought processes, and fair insight and judgment. Dr. Masilamani increased the dosage of Lamictal in addition to scheduling Claimant for more therapy with Ms. Williams. As Claimant complained of sleep issues, her hydroxyzine dosage was increased.

---

[4] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Am. Psych. Assoc., 34 (4th ed. text rev. 2000) ("DSM–IV*"*). On the GAF scale, a higher score correlates with a less severe impairment. The GAF scale was abandoned as a measurement tool in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM–5"), in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM–5 at 16. A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM–IV at 34.

Claimant was examined by Ben Edwards, M.D., on February 1, 2012, for complaints of pelvic discomfort. (Tr. at 320-24). On a review of symptoms, Claimant denied having fatigue, malaise, headache, gastrointestinal issues, genitourinary complaints, endocrine abnormalities, or psychological distress. (Tr. at 322). Her physical examination was entirely normal. Claimant weighed two hundred forty-seven pounds, and her blood pressure was 122/80. Claimant displayed a euthymic mood, appearing alert and in no distress. Upon examination, Claimant had no abdominal tenderness; her bladder, urethra and uterus were normal. Claimant was assessed with candida albecans vaginitis, vaginal candidiasis, and contraceptive management. Claimant was provided prescriptions for Enpresse and Fluconazole.

On February 16, 2012, Claimant returned to Dr. Masilamani reporting that the increase in Lamictal helped stabilize her mood. (Tr. at 386-88). Overall Claimant believed she was "functioning better." Her issues with sleep were improved with hydroxyzine. Claimant described a slightly depressed mood, which she attributed to a recent loss of family members, although she reported she was coping well. Claimant had met with Ms. Williams and used some of the therapist's ideas of how to change things at Claimant's home, such as re-arranging the furniture in her and her daughter's rooms. Claimant's assessment was unchanged, and her medication regimen remained the same, as it appeared to be controlling her symptoms.

On March 14, 2012, Claimant presented to St. Mary's Medical Center after having been assaulted by a family member. (Tr. at 338-47). Claimant complained of moderate pain caused by blows to her head. Although she did not lose consciousness, Claimant felt "dazed." In addition, Claimant complained of a headache and nausea, but no numbness, loss of vision, dizziness, hearing loss, chest pain, difficulty breathing,

weakness, abdominal pain or vomiting. On examination, her right temple was moderately tender and mildly swollen; however, there was no Battle's sign and no "raccoon" eyes. Claimant's neck was supple, non-tender, and displayed normal range of motion. Claimant had mild, soft tissue tenderness in the right and left lower lumbar area. The remainder of her examination was unremarkable. A CT scan of Claimant's head revealed a nearly total opacified left maxillary sinus, but no traumatic findings were seen. (Tr. at 344). An x-ray of the lumbar spine revealed an L5 spondylolysis with grade 1 spondylolistheses at L5-S1. This finding had not changed since September 2009 when a prior film was performed. The remainder of the findings were unremarkable. (Tr. at 343). Claimant was assessed with minor closed head injury resulting from a physical assault and sinusitis. Claimant was provided ibuprofen, Augmentin, and Ultram, advised to apply ice to the head injury, and told to drink fluids. Claimant was discharged in good condition.

Claimant returned to Holzer Clinic on March 29, 2012 for evaluation of her sinuses. (Tr. at 358-61). She complained of nasal congestion, postnasal drainage, frontal headache, and pain in both ears. Claimant also reported decreased bilateral hearing as well as yellow drainage noting the pain was constant and dull both inside and behind her ears. On examination, Claimant presented with normal mood and affect. There was sinus tenderness upon palpation in the bilateral maxillary regions. Otoscopy of the ears showed normal auditory canals and tympanic membranes with ETD bilaterally. Claimant was assessed with postnasal drip, Eustachian tube dysfunction, allergic rhinitis, laryngitis, and pharyngitis. Claimant was provided prescriptions for Zithromax, Astepro, and a Medrol Pak, in addition to a recommendation of daily use of nasal wash and Alkalol.

On April 9, 2012, Claimant returned to Dr. Masilamani. (Tr. at 384-85). Claimant told Dr. Masilamani that she felt depressed, rating her depression as four out of ten but overall, she continued to "function fair." Claimant expressed having difficulties with her sister and complained that she could not visit her mother's house as often because of her sister's presence there. She complained of headaches and reported to Dr. Masilamani that she had been involved in a physical altercation with her sister. Claimant was sleeping more, but her appetite was decreased. On examination, Claimant made good eye contact, was cooperative, and had no psychomotor agitation. Her mood was somewhat depressed, and her affect was restricted. Claimant had limited judgment and insight; however, her thought processes were logical, linear, and coherent. Claimant was assessed with bipolar disorder, type 1; generalized anxiety disorder; alcohol abuse in full, sustained remission; agoraphobia without a history of panic disorder; and rule out borderline intellectual functioning. Claimant's medication regimen of Lamictal and Celexa remained unchanged.

On April 17, 2012, Claimant presented to Dr. Whitmore for follow-up of injuries received in the physical altercation with her sister. (Tr. at 408). Claimant described pain that appeared to be post-concussive headaches, located in the right temple and top of her head. A physical examination was unremarkable. Dr. Whitmore assessed Claimant with post-concussion headaches, allergic rhinitis, and elevated blood pressure. Claimant was provided a prescription for Naproxen.

Claimant returned to Dr. Masilamani on May 9 with complaints of stress, low mood (three out of ten on a ten-point scale), frustration, and irritability. (Tr. at 382-83). On the plus side, Claimant was tolerating her medications well and sleeping well most of the time. She appeared fairly well groomed and was cooperative, although she

made poor eye contact. Claimant was alert and oriented with normal speech and thought process; however, her judgment and insight were limited. Claimant's mood was "somewhat down," and her affect slightly restricted. Claimant's diagnoses did not change. Her prescription for Lamictal was increased to help ease her frustration and irritability.

On May 17, 2012, Claimant presented to Dr. Lowe complaining of back pain. (Tr. at 365-66). Although she wore a lumbar support brace that did offer some relief, Claimant continued to complain of constant back pain that stemmed from her "neck to her tail," causing her legs to get numb and "give out." (Tr. at 365). She reported that her back hurt when she did housework, such as laundry and cleaning floors. Claimant told Dr. Lowe she had a lot of bowel problems and been going to the bathroom quite a bit for several months; however, a review of systems was negative for abdominal pain, nausea or vomiting, and her gastrointestinal system was within normal limits. On examination, Claimant weighed two hundred forty-three pounds. Her blood pressure measured 122/72. Claimant walked without a limp, flexed forward eighty degrees, extended twenty to twenty-five degrees, and could laterally bend twenty-five degrees. While seated and while supine, straight leg raising measured ninety degrees bilaterally; however, there were obvious trigger points in the low back. While lying recumbent, Claimant had some pain across the back and had to roll to the side. Her diagnosis remained spondylolisthesis and low back pain. Dr. Lowe remarked that the Claimant was "doing rather well." Claimant was interested in physical therapy, which considering her status, Dr. Lowe felt was worth a try. He also felt however, that wearing her back brace when performing household tasks or prolonged activities would be beneficial. On the other hand, Dr. Lowe concluded that, ultimately, as Claimant was a

young woman, she needed to work on building her muscles as opposed to wearing the back brace. Claimant was provided an order for physical therapy.

Claimant reported to Huntington Physical Therapy for an initial evaluation on May 21, 2012. (Tr. at 372-74, 796-98). Claimant told Kelly Akers, DPT, that in 2003, while lifting buckets of ice at work, she hurt her low back and, since then, had bilateral leg to ankle symptoms. Claimant stated that the pain made it difficult to walk. Her neurological status examination showed normal sensation. However, manual muscle testing measured 2+/5 strength in all muscle groups. The motion limitation at the most symptomatic area of Claimant's low back segment was due to excessive stiffness and tissue resistance. Claimant was scheduled for physical therapy, two times a week for a total of six weeks.

Beginning on May 25, 2012, Claimant participated in nine physical therapy sessions: May 25, May 30, June 1, June 5, June 7, June 12, June 18, June 22 and June 26. (Tr. at 778-95). At the May sessions, Claimant was not able to appreciate any change in her pain. The therapist felt Claimant could benefit from increased strength to her transverse abdominis muscle to help stabilize the lumbar spine. At her June 1 session, Claimant reported increased pain in the groin after her last treatment. Claimant had no complaints of numbness with bridges but continued to rely on her back brace to "stand up straight and bend over." Claimant did report she was compliant with her home exercise program. On June 5, Claimant reported soreness from her low back to the bilateral glutes, rating the discomfort at eight on the ten-point pain scale. When asked about compliance with home exercises, Claimant responded "some."

Claimant presented to Dr. Masilamani on June 6, 2012. (Tr. at 380-81). Claimant continued to tolerate her medications with no side effects. She complained of

decreased sleep due to pain, decreased appetite, and her mood had been "up and down." Claimant attributed her increased pain to physical therapy. She reported trying to walk for exercise. Upon examination, Claimant's affect was restricted, her judgment and insight limited, and her mood fluctuated. Claimant's assessment remained the same. Dr. Masilamani increased Claimant's dosage of Lamictal and encouraged her to try to go for daily walks.

Continuing with physical therapy, on June 7, Claimant told the physical therapist she was able to finish one load of laundry before having to stop and rest. (Tr. at 786-87). On June 12 Claimant reported pain that radiated down the right leg which began the day before. During therapy, Claimant complained of pain in the left leg radiating to the knee. The left leg pain was centralized to the low back. (Tr. at 784-85). On June 18, Claimant reported she was feeling better rating her pain at rest as five out of ten. She experienced slight pain in the left leg the day before but it resolved that evening and she did not have any at this session. Upon finishing her session, Claimant reported she was able to complete all the exercises easier than last visit and her pain was reduced to four out of ten. The therapist recorded Claimant did not complain of radicular pain at rest or during therapy. (Tr. at 782-83).

Claimant returned to Dr. Lowe on June 21, 2012. (Tr. at 363-64). Claimant had been receiving physical therapy for one month and was no worse, but according to Dr. Lowe, Claimant had "a hard time saying she is better." (Tr. at 363). Claimant was not wearing her back brace at this appointment; however, she indicated that she normally wore it quite a bit. Claimant complained of pain that radiated from the neck to the bilateral hips and legs with numbness and tingling in her bilateral arms, legs, and feet. Claimant said she had not been wearing her brace as much as she should, noting that

she continued to have constant, low back pain making her legs weak and causing her legs to give out. She also reported bowel and bladder issues; however, a review of systems was negative for abdominal pain, nausea or vomiting, and her gastrointestinal system was within normal limits. On examination, Claimant could lie recumbent and prone with no complaints. Her sitting straight leg raise was negative, but her supine straight leg raise was slightly reduced. When palpating her back over the L5-S1 area, and in the area where a free fragment should be found, there was no jumping or reaction by Claimant, nor was there any swelling or trigger points. Dr. Lowe discussed with Claimant that, generally, non-operative care was preferred over surgery for treatment of spondylolisthesis. She was instructed to continue with her medication and return in four months.

At her June 22 physical therapy session, Claimant noted she was confused about continuing with physical therapy as her doctor had discussed surgery but also talked about continuing physical therapy, so she elected to keep this appointment. (Tr. at 780-81). Claimant had increased pain, rated six out of ten, which had been constant for the past several days. She also reported radicular knee pain as well as occasional increase in pain after physical therapy that made her very uncomfortable and "puts [her] to bed." At this visit, Claimant wore her back brace, although she had not worn it at the prior visit. Claimant demonstrated some increased radicular pain was not exacerbated by exercise. Finally, on June 26, Claimant reported no change in her pain level from her last visit. (Tr. at 778-79). She described the pain as radiating from her mid back to bilateral knees. She stated that home exercises did not alleviate her pain. During the session, Claimant had worsening leg pain in some positions, which radiated from her legs to her feet. Claimant was placed on her back and after a short while, she

complained of dizziness, ended the physical therapy session, and called her family to come get her.

Claimant followed up with Daniel Whitmore, D.O., on July 17, 2012, for her post- concussion headaches sustained after the altercation with her sister. (Tr. at 407). As the headaches were improving, Dr. Whitmore elected to avoid maintenance therapy, instead, advising Claimant to take Motrin as needed. Claimant was also assessed with lumbago, knee pain, and GERD for which Claimant was prescribed Dexilant.

Claimant returned to Dr. Masilamani on July 26, 2012. (Tr. at 378-79). On a scale of one to ten, Claimant reported her mood at a one. She was only getting three to four hours of sleep at night, causing her to nap throughout the day. Claimant attributed this to her back pain, noting that participating in physical therapy only made it worse. Claimant's assessment remained the same. Dr. Masilamani added Celexa to Claimant's medication regimen.

Claimant saw Dr. Whitmore on August 15, 2012 with complaints of exhaustion and lack of energy. (Tr. at 406). Claimant's physical examination was unremarkable; however, Dr. Whitmore noted that Claimant wore a back brace. Dr. Whitmore indicated Claimant might require a psychiatric referral as depression could be a cause of her fatigue.

The following week, on August 27, Claimant presented to Dr. Masilamani complaining of lack of sleep and energy for the past two months. (Tr. at 375-77). At this visit, Claimant weighed two hundred forty pounds with a blood pressure of 135/89. Claimant advised that she had starting seeing a mental health therapist again and was tolerating her medications well. She described her mood as antisocial and indicated that her most stressful issue was "fighting disability and getting her disability." Dr.

Masilamani diagnosed Claimant with bipolar disorder, type 1; generalized anxiety disorder; alcohol abuse in full sustained remission; agoraphobia without panic disorder; and rule out borderline intellectual functioning. Claimant was advised to continue therapy to improve her coping skills, and Trazodone was added to her medication regimen to treat insomnia. Claimant returned to Dr. Masilamani on September 27, reporting that the Trazodone helped some with her sleeping issues. (Tr. at 503-04). She rated her mood as four out of ten and commented that if she could sleep through the night, her mood would most likely improve. Consequently, Dr. Masilamani increased the Trazodone dosage to alleviate Claimant's sleep and mood issues.

On October 18, 2012, Claimant was seen by Larry Hagan, M.D., for treatment of chronic, recurrent sinus issues. (Tr. at 456-58). Claimant reported she had suffered chronic sinus infections since the age of 12. She also coughed at night and wheezed with exercise or respiratory infections; however, she had never been diagnosed with asthma. Claimant had an eight year history of chronic urticarial (skin rash causing itch and sometimes swelling) and recurrent angioedema (rash similar to hives) that were recurrent, migratory, pruritic and resolved without sequellae. Claimant also reported a history of recurrent ear and urinary tract infections. A review of systems was positive for GERD; however, Claimant denied nausea, vomiting, diarrhea or any symptoms of IBS. Claimant reported a history of joint pain and myalgia. Claimant was assessed with non-allergic rhinitis, chronic sinusitis, chronic urticarial/angioedema, recurrent sinus, otitis media and urinary tract infections, and possible asthma. Claimant was scheduled for allergy tests and a chest x-ray, as well as provided a prescription for Allegra, Plaquenil, and Vistaril.

Claimant reported to Matthew C. Wilson, M.D., on October 18, 2012, for allergy and pulmonary function tests. (Tr. at 459-62). The spirometry test revealed no significant sign of obstructive pulmonary impairment or restrictive ventilator defect. Claimant did not test positive for any inhalant allergies.

On October 23, 2012, Claimant returned to Dr. Lowe, complaining of back pain and left leg pain. (Tr. at 431-32). The pain was located in the neck and radiated to the bilateral hips and legs. It was worse on the left side and was associated with bilateral numbness and tingling in the arms, legs, and feet. Claimant reported bowel and bladder problems that had been ongoing for years; however, she did not receive treatment for those issues. A review of systems was negative for abdominal pain, vomiting, or nausea, and Claimant's gastrointestinal system was found to be within normal limits. She reported that the pain in her low back was increasing and that participating in physical therapy only made it worse. Claimant also complained of weakness in her legs that caused them to go numb and "give out." Her medications included Empresse, Celexa, Vitamin D, hydroxyzine, Nasonex, cetirizine, Lamictal, Astelin, Dexilant, Calcium, multivitamin, and naproxen.

On examination, Claimant walked with an erect posture and could bear weight equally. Straight leg raising while seated measured ninety degrees bilaterally and eighty degrees bilaterally while supine. Her toe extensors were strong, and pedal pulses were intact. Her knee and ankle reflexes were found intact. Claimant described having "no feeling" in her feet, legs, and at her waist. She did have sensation in a circle around her body at the bottom of her chest between the chest and umbilicus. Dr. Lowe described this as "almost a hysterical type pattern." An x-ray of the thoracic spine did not reveal widening of the pedicles or any unusual findings. An x-ray of the lumbar

spine showed L5-S1 spondylolisthesis as well as a loss of height of the L5-S1 disc space with a positive Knudsen sign. The slippage was nearly twenty percent. The remaining discs were maintained. Claimant was assessed with spondylolisthesis, low back pain, thoracic back pain (non-injury), and osteopenia. She was advised to continue with the current treatment plan, including taking Vitamin D. Dr. Lowe felt surgical intervention was not indicated at this time, as surgical intervention on spondylolisthesis with a patient experiencing a hysterical sensory pattern would provide unpredictable results. Claimant was given an exercise program to help with core strength and was told to continue wearing her back brace.

On October 29, 2012, Claimant reported to Dr. Masilamani that she was still having sleep issues, stating that she was not getting as much sleep as she used to get. Although her mood was slightly agitated (rating it five out of ten), she was "overall okay." (Tr. at 505-06). Claimant rated her multiple doctor visits, medical tests, and increased pain as the most stressful events in her life. On examination, Claimant's mood was "in the middle" and her affect slightly restricted. Claimant demonstrated thought processes that were logical, linear, and coherent, but her judgment and insight were limited. Dr. Masilamani increased the Trazodone dosage to help with sleep issues and advised Claimant to go outside more—at least one to two times per day.

Claimant returned to Dr. Wilson on November 8, 2012 with complaints of congestion. (Tr. at 440-43). Claimant reported after her last visit with him, her toe, then chest and arm started to swell. She was seen in the emergency room and told she had allergies, was placed on prednisone that resolved the issue eventually. Claimant had negative results on all allergy skin tests. With the exception of history of joint pain and/or myalgia and "urinary problems noted," a review of systems was negative,

including no symptoms of IBS, no dysuria, hematuria, polyuria, urinary urgency or hesitancy. A spirometry test was administered with negative results. Claimant was assessed with non-allergic rhinitis, history of nasal polyps, chronic sinusitis, history of angioedema/urticarial and bipolar disorder.

Dr. Lowe saw Claimant on November 20, 2o12. (Tr. at 429-30). He noted Claimant wore her back brace and had been doing her home exercises, but according to Claimant, there was no improvement. She complained of constant back pain, weakness, and numbness in her legs that caused them to "give out," and she had bowel problems, ongoing for several months. A review of systems was negative for abdominal pain, vomiting, nausea, and Claimant's gastrointestinal system was within normal limits. On examination, Dr. Lowe recorded Claimant was "doing better." Claimant demonstrated normal movement with extension, as well as lateral bending measuring twenty to twenty-five degrees. While seated, bilateral straight leg raise was negative. While supine, straight leg raise was tolerated to eighty degrees bilaterally. Sensation was intact in her feet, though "less than perfect," and sensation in her abdomen between the pelvic and umbilicus, as well as in the back, was normal. Claimant was assessed with spondylolisthesis, low back pain, non-injury thoracic pain, and osteopenia. Dr. Lowe remarked that the findings were as expected in a patient who had spondylolisthesis with superimposed hysterical, unexplained sensory pattern. Claimant was advised to continue taking Naproxen and wear her back brace intermittently. Dr. Lowe opined there was no special medical treatment needed at this time.

Claimant continued mental health treatment with Dr. Masilamani on December 10, 2012. (Tr. at 507-08). Claimant reported she was not feeling well and her mood was

down due to back pain and family issues; however, she reported her overall functioning was "ok." Claimant appeared depressed, with a broad, reactive affect. She was alert, made good eye contact, demonstrated normal speech and thought process, but her judgment and insight remained limited. Claimant was diagnosed with alcohol abuse, in remission; bipolar disorder, type 1, most recent episode depressed; and generalized anxiety disorder. Claimant was advised to continue taking her medications and work with her therapist, and she was encouraged to exercise.

Claimant returned to Dr. Wilson on December 28, 2012, with excessive nasal congestion and drainage. (Tr. at 433-34). A review of systems was unremarkable other than history of joint pain or myalgia and GERD. The review was negative for nausea, vomiting and diarrhea. There were no IBS symptoms, such as abdominal cramping, bloating, hematochezia, melena, or mucoid bowel movement. Dr. Wilson noted Claimant had negative results to all tests for inhalant and food allergies and a negative urticarial profile. Claimant was assessed with probable acute sinusitis, chronic urticarial, and GERD. Claimant was provided with a Medrol Dose Pak and Augmentin.

Claimant presented to Dr. Whitmore on January 17, 2013. (Tr. at 467-68). She told him that, overall, she was "doing well." Claimant had lost nine pounds since her last visit. They discussed meeting with the nutritionist to work-up a diet and exercise plan with a goal of exercise for forty-five minutes a day. Claimant was assessed with depression, ("doing very well on Celexa and hydroxyzine), GERD, ("doing well on Dexilant"), hyperglycemia and hyperlipidemia, (to be treated with diet and exercise).

On January 23, 2013, Claimant was seen by Dr. Masilamani. (Tr. at 509-10). She reported improved sleep, even without taking trazodone, and a stable mood, made better since she began to lose weight. Upon examination, Claimant's mood was good

and her affect euthymic. Claimant was encouraged to start walking twenty minutes a day for exercise, see the nutritionist, and meet with her therapist. Claimant was advised to continue her medication regimen.

Claimant returned to Dr. Lowe on February 13, 2013, reporting that her back symptoms remained the same. (Tr. at 472-73). A review of systems was within normal limits. On examination, Claimant walked without a limp, and had relatively good mobility of her back, intact reflexes at the ankles and knees, strong toe extensors, negative straight leg raise both supine and sitting, and no trigger points in the low back. Claimant was advised to continue to work on strengthening her core and to return in two to three months.

Claimant saw Dr. Masilamani on February 25, 2013. (Tr. at 511-12). Claimant reported her mood was stable, rating it five to six out of ten. Also, she was not having any trouble sleeping, describing her sleep as "good." At this visit, Claimant weighed two hundred twenty-three pounds, and her blood pressure was 132/86. On examination, her mood was fair, affect euthymic, speech and thought process normal, although her judgment and insight remained limited. Claimant was encouraged to continue to walk for exercise, remain on her medication, and take some time for herself.

On February 27, 2013, Claimant presented to Ben Edwards, M.D., for an annual gynecologic examination. (Tr. at 556-61). Claimant complained of pelvic pain. A review of systems was positive for abdominal pain, pelvic pain, and painful periods with excessive bleeding, but was negative for abdominal bloating, diarrhea, constipation, urinary urgency, anxiety, depression, or premenstrual syndrome. On examination, the abdomen was non-tender with no masses found. The uterus was normal in size with

no tenderness or masses. Claimant's mood and affect were normal. Claimant was assessed with dysmenorrhea, endometriosis, and female pelvic pain. Dr. Edwards prescribed Naproxen and Empresse and ordered an ultrasound to investigate her complaints of pelvic pain.

One month later, on March 27, Claimant underwent a transvaginal ultrasound performed by William Burns, M.D. (Tr. at 554-55). The ultrasound revealed that Claimant's uterus was normal in size with no evidence of myometrial lesion. The endometrial stripe was well defined, following a normal anatomic course measuring 4.9 mm in thickness. A tiny hyperechoic focus was found in the anterior endometrium that was possibly a miniscule polyp. Claimant's ovaries were normal in size with no evidence of intra-ovarian or extra-ovarian adnexal lesion seen. The findings, other than the endometrial finding, were found to be normal.

Claimant returned to Dr. Edwards on April 17, 2013 with complaints of pelvic pain and menoetrrhagia. (Tr. at 547-51). She described the onset of moderate deep pelvic pain that was gradual over a period of months. A review of systems was positive for painful and irregular periods, and excessive bleeding during periods; however, it was negative for abdominal pain, bloating, diarrhea, constipation or bright red blood from the rectum, anxiety, depression or premenstrual syndrome. Claimant's physical examination was unremarkable, except for tenderness of the uterus. At this visit, Claimant's listed active problems included arthritis, backache, bladder disorders, candida albicans vaginitis, change in stool, chest tightness, cholelithiasis, cholelithiasis with chronic cholecystitis, dysmenorrhea, endometriosis, GERD, female pelvic pain, polyuria, hay fever, headache, heart rate and rhythm, hemorrhoids, IBS, recent change in weight, vaginal candidiasis, and vision impairment. Claimant was scheduled for a

laparoscopy, D & C, and hysteroscopy that occurred on April 25. (Tr. at 530-32).The post-operative diagnosis was menometrorrhagia and chronic pelvic pain, polycystic ovarian syndrome, and endometriosis.

On April 23, 2013, Claimant was examined by Dr. Lowe with complaints of back pain after doing housework. (Tr. at 678-79). She described the pain as radiating from her neck to her hips and legs, worse on the left. She had numbness and tingling in her arms, legs, and feet. On examination, Claimant walked without a limp and had strong toe flexors and intact reflexes. Claimant had no specific trigger points in the low back. While seated, her straight leg raise was negative, but while supine, it was limited to sixty-five degrees. Dr. Lowe remarked that after her last visit, he was concerned about trunk conditioning; however, at this visit, Claimant was able to get on and off the examining table with ease. Claimant was able to sit with legs extended, the only problem being the positive supine straight leg raising in the form of tight hamstring muscles. Claimant was advised to exercise and continue her medications.

Claimant saw Dr. Masilamani on April 29, 2013 reporting that her mood was stable, and she had no sleep issues; however, she was having pelvic pain due to endometriosis and described the pain as ten out of ten. (Tr. at 744-46). On examination, Claimant presented with a down mood and euthymic affect. Her weight at this visit was two hundred twenty-two pounds. Claimant was encouraged to exercise and see her therapist, as well as continue with her medication regimen.

Claimant returned to Dr. Edwards on May 15, 2013 for post-surgical examination. (Tr. at 525-29). An examination of Claimant's abdomen was unremarkable. Claimant was assessed with endometriosis and polycystic ovarian syndrome. She was given a prescription for Jolessa.

Claimant saw Dr. Masilamani on July 1, 2013. (Tr. at 740-43). Claimant rated her sleep as "fair," and her mood stable, but with periods of irritability that she attributed to her physical health. On examination, Claimant's mood was fair and her affect euthymic. Claimant was cooperative with normal speech and thought process, and her judgment and insight were deemed fair. Claimant was advised to exercise, go out as much as possible, and continue her medication regimen.

On July 18, 2013, Claimant saw Dr. Whitmore, remarking to him that, overall, she was "doing well," and had no specific complaints. (Tr. at 771-72). Claimant took Naproxen for back pain as needed. Her physical examination was unremarkable other than some acanthus nigricans of the skin. Claimant was assessed with a history of L5-S1 anterolisthesis and L5 spondylosis; however, at this time, Claimant was stable with no "out of the ordinary" back pain. Claimant was assessed with back pain; depression for which she received treatment from Dr. Masilamani; allergic rhinitis; GERD that was controlled well with Dexilant; hyperglycemia; and hyperlipidemia.

Claimant returned to Dr. Lowe on July 23, 2013, with complaints of pain throughout her entire back, as well as occasional neck pain. (Tr. at 680-81). She described the pain as radiating from her neck bilaterally to her hips and legs, worse on the right side. She had numbness and tingling in her feet, again worse on the right. Claimant rated the pain as seven on a ten-point pain scale. She also complained of bowel and bladder problems; however, a review of systems was negative for abdominal pain, nausea or vomiting, and her gastrointestinal system was within normal limits. On examination, Dr. Lowe noted that he was seeing Claimant on a "good day." She walked without a limp, flexed forward to eighty degrees, extended twenty-five degrees, and could laterally bend twenty-five degrees. While seated, straight leg raise measured

ninety degrees bilaterally and, while supine, eighty degrees bilaterally. The bowstring sign was negative. Range of motion of the hips was normal, and Claimant's sensation was intact. Dr. Lowe did not find any trigger points. Dr. Lowe felt that Claimant could limit wearing her back brace, using it if the pain were to flare up, or if she was going to walk for an extended time, such as when shopping at stores. Dr. Lowe opined that Claimant was doing well and did not need to alter her medication regimen. He urged her to continue being active.

Claimant returned to Dr. Masilamani on August 5, 2013, reporting that, overall, her mood was stable despite having some pain issues. (Tr. at 737-39). She reported that she was able to get adequate sleep and had no problem with appetite; in fact, she was trying to "eat better." Claimant's examination remained unchanged from her last visit. She reported the most stress related to getting her child ready for school. Claimant was advised to exercise, try to walk, make healthy dietary choices, and continue her current medication regimen.

On November 4, 2013, Claimant saw Dr. Masilamani and told him her depression had increased due to the loss of a pet and the recent loss of loved ones. (Tr. at 733-36). She had not been sleeping well, and although Claimant said her mood was stable, she had a lot of stress due to family issues. On examination, Claimant's mood was down and her affect euthymic. Claimant was encouraged to exercise, walk daily, and return in one month. Dr. Masilamani increased Trazodone and noted that they might discuss a referral to a psychologist at her next visit.

On December 4, 2013, Claimant reported to Dr. Masilamani that she was getting enough sleep, she had no problem with her appetite, and her mood was stable, describing most days as "decent." (Tr. at 729-32). However, she did report continued

back problems. On examination, Claimant's mood was fair and her affect euthymic. Claimant was encouraged to exercise and continue her medication. Claimant advised Dr. Masilamani she would like to schedule monthly appointments.

On December 10, 2013, Claimant presented to Med Express with complaints of abdominal pain and left upper quadrant pain, as well as diarrhea, constipation, nausea and vomiting that began three days prior. (Tr. at 637-41). At this visit, Claimant weighed two hundred thirty-eight pounds and her blood pressure measured 124/78. On examination, both the right and left upper quadrants were tender to palpation. There were no masses or megly noted and there was negative CVA tenderness. An x-ray of the abdomen was found unremarkable. Claimant was assessed with constipation and advised to drink fluids. She was given a prescription for Senokot.

Claimant returned to Dr. Masilamani on January 8, 2014 reporting she was not having sleep or appetite issues and her mood was stable. (Tr. at 725-28). On examination, Claimant was cooperative, demonstrated normal speech and thought process, and showed fair insight and judgment. Claimant's mood was down and her affect euthymic. She was advised to exercise and begin walking twenty minutes per day, as well as maintain her current medication regimen. Dr. Masilamani listed Claimant's active problems as allergic rhinitis (unspecified); bipolar, affective, depression (moderate); coronary atherosel, unspecified vessel; GERD; generalized anxiety disorder; manic depressive, unspecified; other and unspecified hyperlipidemia; other disorders thyroid; and other malaise and fatigue.

On February 5, 2014, Claimant returned to Dr. Masilamani reporting she had no sleep or appetite issues and her mood was stable; however, she was feeling increasingly tired and did not feel like being active. (Tr. at 721-24). At this visit,

Claimant weighed two hundred forty-three pounds. Upon examination, Claimant made good eye contact, showed normal speech, coherent thought process, demonstrated a fair mood and euthymic affect, and her judgment and insight were fair. Claimant was once again encouraged to exercise and start walking outside once the weather improved. Claimant reported her biggest stressor to be her sister-in-law. Claimant was scheduled to follow up with her therapist.

Claimant returned to Dr. Whitmore on February 12, 2014, stating that other than a recent diagnosis of sinusitis, she was "doing well" with "no complaints or concerns." (Tr. at 766-67). On examination, Claimant's heart and lungs were normal with no wheezes, rhonchi, or rales noted. Her abdomen was soft, obese, and non-tender. There was no edema or rash on the extremities and no neuropathy with filament testing. Claimant was assessed with maxillary sinusitis, (treated with Augmentin); depression (treated by Dr. Masilamani and doing well with Celexa and hydroxyzine); chronic, annual allergic rhinitis (treated with Astelin, Nasonex and Zyrtec); GERD (treated with Omeprazole); hyperglycemia; obesity (Claimant had gained sixteen pounds since her last visit and did not appear to be motivated to lose weight); and chronic lumbar back pain from L5-S1 anterolisthesis and spondylolysis (treated with naproxen on per need basis as well as encouraged to exercise and lose weight).

On March 5, 2014, Claimant told Dr. Masilamani that her sleep was variable, her appetite normal, and her mood stable; however, she continued to have severe back pain. (Tr. at 717-20). Upon examination, Claimant's mood was fair and her affect euthymic. Claimant was diagnosed with alcohol abuse in remission; bipolar disorder, type 1, most recent episode depression; and generalized anxiety disorder. Dr.

Masilamani referred Claimant to Dr. Jimmy Adams at active physical medicine to help with Claimant's pain issues. For generalized anxiety disorder, Claimant was provided prescriptions for Celexa, Hydroxyzine, Lamictal and Trazodone. Claimant was again encouraged to exercise and follow-up with her therapist.

Dr. Whitmore examined Claimant on March 25, 2014 to follow up her hypertension, noting Claimant had started taking Lisinopril the week before and her blood pressure had improved. (Tr. at 763). Claimant reported that she continued to have low back pain. At this visit, Claimant weighed two hundred forty-four pounds and had a blood pressure of 127/73. Her physical examination was unremarkable other than it was noted Claimant wore a back brace. Claimant was advised to continue taking Lisinopril and follow-up with Dr. Lowe for back pain.

On April 1, 2014, Claimant returned to Dr. Lowe, reporting that she was "getting along pretty good." (Tr. at 682-83). Nevertheless, Claimant complained of pain in the entire back, along with occasional neck pain that radiated into her hips and legs, worse on the right side. Claimant rated the pain as seven out of ten. In addition, she reported numbness and tingling in both feet, worse on the right, and bowel and bladder problems that had been ongoing for years. A review of systems was within normal limits. On examination, without wearing her back brace, Claimant had a normal gait with no limp. While seated, her straight leg raise measured ninety degrees and was seventy degrees in the supine position. There were no radicular issues, although Claimant exhibited some low back pain. When bending the knees, Claimant could do abdominal isometrics. Claimant mentioned that she lost weight after having sinus surgery and wanted to continue losing weight, but had been gaining weight back instead. Dr. Lowe noted that Claimant was wearing her back brace outside her clothes

so he talked with her about wearing it between a t-shirt and her outer shirt. He advised that although surgery could be helpful for spondylolisthesis in some instances, when considering Claimant's combined issues of nerve problems and anxiety, and the fact that she was "getting along rather well," he was not inclined to change her current course of treatment. She was told to return in three weeks to review her laboratory results.

Claimant presented to Dr. Edwards on April 9, 2014, with breast-related complaints. (Tr. at 515-20). A review of systems was negative for malaise, fatigue, abdominal pain, abdominal bloating, diarrhea, constipation, urinary incontinence or frequency, depression or premenstrual syndrome. Claimant's mood and affect were normal, as was her physical examination. Claimant was assessed with endometriosis, polycystic ovarian syndrome, nipple discharge, and non-puerperal galactorrhea.

That same day, Claimant was seen by Dr. Masilamani, reporting that she was having a flare up of back pain; however, she had no sleep or appetite issues, and her mood was stable. (Tr. at 713-16). Claimant's physical examination was unremarkable; her mood was fair and her affect was euthymic. Claimant received refills of Celexa, hydroxyzine, and Trazodone. She was advised to exercise and continue her current medication regimen.

Later that month, on April 22, Claimant returned to Dr. Lowe. On examination, Claimant weighed two hundred forty pounds. (Tr. at 684-85). Claimant presented in "good spirits," and according to Dr. Lowe wore her back brace and seemed "to be doing well with it." Claimant walked without a limp. Straight leg raise while seated measured ninety degrees. Claimant's lab reports indicated that her vitamin D level had risen to normal range; however, the platelet volume had increased from 2011. Claimant was

assessed with low back pain, spondylolisthesis, non-injury thoracic back pain, and osteopenia. Dr. Lowe opined that Claimant's "total picture is favorable at this point." She was advised to return in three to four months and in the meantime, her platelet volume would be re-examined.

On May 6, 2014, Claimant presented to Jessica L. Williams at Midland Behavioral Health for counseling. (Tr. at 800-02). With respect to her history, Claimant reported having some problems with reading. She had worked off and on over the years, and was applying for disability due to a back injury. Claimant attended church intermittently and lived with her child. Claimant currently complained of depression and insomnia, describing her depression as moderate and her insomnia as frequent. Claimant had problems dealing with stress, but her strengths included family support, ability to learn and implement new coping skills, and access to transportation and community resources. Claimant presented with a depressed mood and affect; however, she was oriented to time, place, and people. Her thought process, memory, cognitive function, judgment, and insight were intact. Claimant was encouraged to use improved coping skills. Ms. Williams noted that Claimant was capable of recognizing her emotions and regulating them most of the time. Claimant was diagnosed with bipolar II disorder, which was stable and controlled.

The following week on May 14, Claimant returned to Dr. Masilamani, stating that while her mood was stable, she felt increased irritability and had not been sleeping well. (Tr. at 710-12). At this visit, Claimant weighed two hundred forty-one pounds and her blood pressure was 138/81. Claimant demonstrated normal speech and thought process; her eye contract was good; there was no psychomotor agitation noted; her mood was irritable; and her affect was euthymic. Dr. Masilamani increased Claimant's

dosage of Trazodone and advised her to follow up with her other physicians for sinus issues and fatigue. She returned to Dr. Masilamani one month later on June 18 advising him that she now slept fairly well most nights, and although she was upset about a recent family issue, her mood had been stable. (Tr. at 707-09). Claimant presented with an upset mood and euthymic affect. Claimant was encouraged to exercise, remain on her medication regimen, and participate in outside activities. Dr. Masilamani advised Claimant he would schedule her to see a psychologist.

On June 23, 2014, Claimant returned to counseling with Jessica Williams. (Tr. at 803-04). Claimant presented with an anxious mood and affect. She was upset with family members over their criticisms about the way she cared for her child. Claimant reported she was trying to organize her child's things, but it was very difficult due to her depression. Ms. Williams encouraged Claimant to continue with the project and by the end of the counseling session, Claimant was "laughing and appeared to feel a little better." Claimant was advised to continue doing things, both inside and outside her home, to help improve her mood. Claimant returned to Ms. Williams one month later on July 21 reporting she was doing "pretty well" but had low energy. (Tr. at 805-06). Her mood and affect were depressed at this visit. Claimant was diagnosed with bipolar II disorder, which was stable and controlled.

The following day, on July 22, Claimant presented to Dr. Lowe with complaints of continued low back and bilateral leg pain, left side greater than right. (Tr. at 686-87). Claimant rated her back pain as averaging seven to eight out of ten. Claimant also continued to wear her back brace. On examination, Claimant walked without a limp and did not have any trigger points in her back. Straight leg raise while seated measured ninety degrees. Straight leg raise while supine measured seventy degrees;

however, this caused knee pain as opposed to back pain. As Claimant's back brace appeared worn out, Dr. Lowe provided Claimant with a prescription for a new back brace and ordered lab work.

Claimant returned to Dr. Whitmore on August 12, reporting no specific complaints or concerns. (Tr. at 761-62). Claimant's current medication regimen included Naproxen (pain relief), Celexa (depression), hydroxyzine (anxiety), Astelin (rhinitis), Zyrtec (antihistamine), Enpresse (birth control), omeprazole (GERD), Lisinopril (hypertension), Lamictal (mood), and trazodone (depression and anxiety). A review of systems was negative for any gastrointestinal issues such as constipation, diarrhea, melan, or hematochezia and was otherwise unremarkable with the exception of chronic back pain. Nevertheless, Claimant's past medical history included, in part, irritable bowel syndrome. At this visit, Claimant weighed two hundred fifty-five pounds and had a blood pressure of 123/79. Claimant's physical examination was unremarkable. Claimant was assessed with hypertension that was well-controlled, allergic rhinitis well controlled; depression; GERD, well controlled; and history of hyperglycemia. Claimant's weight had increased by eleven pounds since her last visit; attributed, in part, to her inability to be active due to back pain.

On August 19, 2014, Claimant presented to Dr. Lowe with complaints of back pain and occasional neck pain that radiated into her hips and legs. She continued to rate her pain as seven to eight out of ten. (Tr. at 688-89). On examination, her sitting straight leg raise measured ninety degrees. Claimant's toe extensors were strong, and the reflexes in her knees and ankles were intact. Dr. Lowe discussed whether Claimant's condition warranted fusion surgery; however, he believed there was not enough evidence to change Claimant's current treatment plan. Claimant was advised

to wear her back brace and return in six weeks.

Claimant met with Jessica Williams for therapy on August 21, 2014. (Tr. at 807-08). Ms. Williams found Claimant to have a depressed mood and affect; however, she was alert, demonstrating intact thought process, memory, judgment, insight and cognitive function. Claimant remained able to learn and implement new coping skills. Claimant reported fatigue due to getting her child back in the routine of going to school. She reported avoiding certain family members who were causing her stress, telling Ms. Williams "things have been okay."

On September 10, 2014, Claimant returned to Dr. Masilamani, reporting she had no sleep or appetite issues, nor did she have any recent stressful events. (Tr. at 704-05). Claimant reported her mood had been stable (five to six on a scale of ten). On examination, Claimant made good eye contact, showed no psychomotor agitation, and demonstrated normal speech and thought processes. Her mood was good, and her affect was broad and reactive. Claimant was advised to continue her medication regimen and avoid family members who caused her stress.

Claimant returned to Med Express on September 22, 2014 with complaints of painful, swollen left knee not attributed to an injury. (Tr. at 647-49). Claimant said the pain began the day before and was located in the anterior left knee with worsening pain upon weight bearing and with movement. Upon examination, there appeared full strength against resistance in the left knee; however, there was limited flexion and extension due to pain. There appeared normal laxity of the left knee but swelling was noted and there was tenderness to the left patella on palpation. An x-ray of the left knee revealed well-maintained joint spaces with no abnormal calcification, fracture or periosteal reaction. There was no evidence of focal lytic or sclerotic lesion. Trace

suprapatellar effusion was noted. The overall impression was no acute bone abnormality. (Tr. at 659). Claimant was assessed with left knee effusion and advised to apply ice to the knee, get adequate rest, wrap the knee with ace bandage, and take prednisone for five days.

One day later, Claimant presented to Dr. Whitmore for follow up of diabetes mellitus. (Tr. at 753-57). Claimant had no complaints of worsening vision, chest pain, dyspnea, numbness, or tingling in her limbs. A review of systems was negative. Past medical history included recent non-compliance with diet and exercise. Claimant's active medical problems included allergic rhinitis, unspecified; benign neoplasm lesion of the mouth; bipolar affective disorder, depression, moderate; cholelithiasis; diabetes mellitus, type 2; endometriosis; GERD; generalized anxiety disorder; manic depressive, unspecified; hyperlipidemia; malaise and fatigue; and spondylolisthesis at L5-S1. At this visit, Claimant weighed two hundred fifty-three pounds with a measured blood pressure of 131/88. Her physical examination was normal. Claimant had normal deep tendon reflexes, and no peripheral neuropathy was noted during filamentis testing. She was assessed with Type 2 diabetes mellitus, well controlled with Metformin.

Claimant returned to Dr. Lowe on September 30, 2014 reporting she was having a bad day due to pain located in her entire back and occasionally in her neck. (Tr. at 690-91). The pain radiated into both hips and legs, worse on the right side, with numbness and tingling of the feet. Claimant rated her pain as averaging eight out of ten. Claimant reported bowel and bladder problems and urinary tract infections. Claimant also reported left knee pain and swelling. On examination, Claimant walked without a limp. Dr. Lowe noted that Claimant wore her back brace. Her toe extensors

were strong, and straight leg raise while seated was ninety degrees. The reflexes in her knees and ankles were intact, and she did not appear to have any significant sensory change. Dr. Lowe advised Claimant that, frequently at her age, patients with spondylolisthesis required surgical intervention; however, considering that he was seeing her on a "bad day," he did not feel surgery was an appropriate course of action in her case. Instead, Claimant was prescribed Neurontin for pain relief and Vitamin D. Claimant was advised to continue her medication regimen.

Claimant returned to Dr. Lowe the following month on October 21, reporting continued back pain that rated seven out of ten. (Tr. at 692-93). Dr. Lowe noted that an x-ray of the lumber spine showed osteopenia. Claimant was counseled on exercise, abdominal isometrics, and press-up exercises. Dr. Lowe advised Claimant to work on strengthening and stretching at home.

The following day, on October 22, Claimant presented to Dr. Masilamani complaining of back pain and anticipating back surgery. (Tr. at 700-03). Claimant told Dr. Masilamani that her mood was helped by taking Celexa and, overall, trazodone had helped with her sleep issues. Claimant described her mood as stable, but she had been irritable at times due to illness and back pain. On examination, Claimant's mood was fair, and her affect was euthymic. She was encouraged to exercise, return to Ms. Williams for therapy, continue her medications, and follow up with Drs. Lowe and Whitmore for her medical issues.

On October 28, 2014, Claimant was seen by Ms. Williams reporting ongoing issues with some family members. (Tr. at 809-10). Ms. Williams noted that Claimant was continuing to clear out her house, a project she had been talking about since starting therapy with Ms. Williams. Claimant presented with a depressed mood and

affect. However, her thought process, memory, cognitive function, judgment, and insight were intact. Claimant was assessed with controlled bipolar II disorder.

### B. Consultative Assessments and Other Opinions

On December 21, 2012, G. David Allen, Ph.D., completed a Psychiatric Review Technique. (Tr. at 89-91). He found that Claimant had medically determinable impairments under Listing 12.04 (affective disorders) and Listing 12.06 (anxiety related disorders), which did not precisely satisfy the diagnostic criteria. Dr. Allen determined that Claimant had mild restrictions of activities of daily living and in maintaining social function, concentration, persistence, and pace. Claimant had no episodes of decompensation, and there was no evidence to satisfy the paragraph "C" criteria. Dr. Allen opined that Claimant's mental functional limitations did not exceed mild severity. On April 3, 2013, Philip E. Comer, Ph.D., completed a Psychiatric Review Technique, concurring with the findings of Dr. Allen. (Tr. at 104-06). Dr. Comer agreed that the severity of mental functional limitation did not exceed mild, adding that the new medical evidence in the file did not show any additional significant mental and/or emotional limitations. Therefore, Dr. Comer affirmed Dr. Allen's findings as written.

On December 26, 2012, Rabah Boukhemis, M.D., completed a Physical Residual Functional Capacity Assessment. (Tr. at 91-93). Dr. Boukhemis determined that Claimant could occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand, walk and/or sit about six hours in an eight hour workday; and had unlimited ability to push and/or pull with the listed weight restrictions. Claimant could frequently climb ramps or stairs, balance, stoop, kneel, or crouch and could occasionally crawl and climb ladders, ropes, or scaffolds. Claimant had no manipulative, visual, or communicative limitations. As for environmental limitations,

Claimant was unlimited in her exposure to wetness, humidity, and noise; however, she needed to avoid concentrated exposure to extreme cold or heat, vibration, fumes, odors, dusts, gases, poor ventilation and hazards, such as machinery or heights. On April 3, 2013, Pedro F. Lo, M.D., completed a Physical Residual Functional Capacity Assessment, drawing identical conclusions to those of Dr. Boukhemis. (Tr. at 106-08). Under the additional explanation section of the form, Dr. Lo commented that Claimant was previously denied disability at medium residual functional capacity. He listed Claimant's allegations as lumbar back problems, IBS, vision problems, migraines, knee problems, problems with shoulders and hands, and allergies. Dr. Lo opined that Claimant had spondylolisthesis 20% grade and pars defect; however, there was no neurological loss. Claimant had fair range of motion; her straight leg raise was negative; and she was obese with a body mass index of 36. Dr. Lo affirmed the Physical Residual Functional Capacity Assessment prepared by Dr. Boukhemis as written.

## VII.   Discussion

Having thoroughly considered the record, the Court concludes that neither of Claimant's challenges to the Commissioner's decision has merit. Each challenge is considered below.

### A.  RFC Finding

Claimant is critical of the ALJ's RFC finding, arguing that it failed to account for the combined effect of all of her impairments and was based on an improper assessment of her credibility. Between the third and fourth steps of the sequential disability determination process, the ALJ must ascertain a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." *See* Social Security Ruling ("SSR") 96-8p,

1996 WL 374184, at *1 (S.S.A. 1996). RFC is a measurement of the **most** that a claimant can do despite his or her limitations, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to SSR 96-8p, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ must assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR 416.945(b-d). Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts

(e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

Here, the ALJ provided a thorough discussion of Claimant's impairments and her RFC, addressing the objective medical evidence, Claimant's statements regarding the severity and persistence of her symptoms, Claimant's reported activities, and the function-by-function assessments provided by agency consultants. Contrary to Claimant's assertion, the ALJ did consider the functional limitations associated with all of Claimant's medically determinable impairments, including her non-severe conditions. For example, at step two of the process, the ALJ addressed Claimant's functional limitations, acknowledging that she had some motion loss, loss of sensation, and stiffness in her back. (Tr. at 14). The ALJ also accepted that Claimant had some incontinence related to her IBS, and experienced mood swings and related symptoms. (Tr. at 14-15). The ALJ reviewed the evidence regarding Claimant's gynecological and pelvic issues, concluding that these impairments were entirely asymptomatic after treatment in April 2013. (Tr. at 15). Similarly, while Claimant had hypertension and diabetes, her symptoms were well controlled on medication and, with diet and exercise, Claimant would likely have no abnormal findings at all. As far as Claimant's headaches and vision problems, the ALJ indicated that these conditions should not interfere with

Claimant's ability to work, because they could be corrected with an updated prescription for eyeglasses. Consequently, the ALJ clearly considered the functional effect of each of Claimant's impairments.

In analyzing Claimant's RFC, the ALJ also reviewed and considered the reliability of Claimant's statements regarding the disabling effects of her impairments. Pursuant to 20 C.F.R. § 416.929, when evaluating a claimant's report of symptom severity and persistence, the ALJ is required to use a two-step process. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the symptoms alleged by the Claimant. 20 C.F.R. § 416.929(a). "[A]n individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." SSR 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016).[5] Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and

[5] The SSA recently provided guidance for evaluating a claimant's report of symptoms in the form of SSR 16-3p. In doing so, the SSA rescinded SSR 96-7p, 1996 WL 374186, which Claimant relied on in her memorandum. The undersigned finds it appropriate to consider Claimant's second challenge under the more recent Ruling as it "is a clarification of, rather than a change to, existing law." *Matula v. Colvin*, No. 14 C 7679, 2016 WL 2899267, at *7 n.2 (N.D. Ill. May 17, 2016); *see also Morris v. Colvin*, No. 14-CV-689, 2016 WL 3085427, at *8 n.7 (W.D.N.Y. June 2, 2016).

severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. § 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* § 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 416.929(c)(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical

evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

SSR 16-3p provides further guidance on how to evaluate a claimant's statements regarding the intensity, persistence, and limiting effects of his or her symptoms. For example, the Ruling stresses that the consistency of a claimant's own statements should be considered in determining whether a claimant's reported symptoms affect his or her ability to perform work-related activities. *Id.* at *8. Likewise, the longitudinal medical record is a valuable indicator of the extent to which a claimant's reported symptoms will reduce his or her capacity to perform work-related activities. *Id.* A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms may support a claimant's report of symptoms. *Id.* On the other hand, an ALJ "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record," where "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints," or "the individual fails to follow prescribed treatment that might improve symptoms." *Id.*

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the

individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person"; rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Claimant's contention that the ALJ erred in discounting Claimant's credibility, because Claimant's statements and the objective evidence were mutually supportive of a disability finding does not actually address the propriety of the ALJ's credibility assessment. Instead, Claimant is merely reweighing the evidence, choosing to place more evidentiary emphasis on her own statements than did the ALJ. Such an exercise is not one in which this Court will engage. Rather, the Court will only review the

decision to ascertain whether the proper process was followed and the resulting finding is supported by substantial evidence. Here, as more fully discussed below, the written decision clearly reflects that the ALJ performed the proper two-step credibility analysis and supported her finding with detailed pieces of evidence.

Claimant's related criticism, that the ALJ simply regurgitated credibility "boilerplate," is not a fair representation of the ALJ's discussion. Indeed, the ALJ provided numerous case-specific reasons for her decision to discount the reliability of Claimant's statements. For example, the ALJ felt that Claimant's "subjective descriptions of symptoms severity and functional limitation seem[ed] rather excessive and exaggerated" in light of Claimant's noncompliance with treatment recommendations. (Tr. at 21). In addition, the ALJ pointed out that Claimant had not required surgical intervention or aggressive medical management, and her diagnostic studies and clinical findings did not reflect any significant progression of her impairments. The ALJ also noted that Claimant had no physician support for a finding of disability; to the contrary, Dr. Lowe seemed to feel that conservative treatment had been successful. (*Id.*). The ALJ further considered the record regarding Claimant's IBS, indicating that although Claimant complained of incontinence, there were few reported incidents in the record. Claimant was not required to wear protective undergarments, and she reported a healthy appetite, denying significant weight loss attributable to her disease. (Tr. at 22). In fact, the record shows that Claimant had a tendency to gain weight. Despite repeated advice from her treating providers to lose weight, Claimant did not demonstrate any effort to pursue a weight loss regimen. In addition, Claimant's mental health treatment was ongoing, and her psychological conditions were deemed stable on medication. (*Id.*). As part of the credibility analysis, the ALJ commented on

the medical evidence from a longitudinal perspective and referenced particular clinical notes and diagnostic findings corroborating her conclusion that Claimant exaggerated the disabling effects of her symptoms. Consequently, the ALJ's credibility analysis and discussion complied with the applicable rules and regulations.

Finally, the ALJ also considered the findings made by ALJ Dummer in Claimant's prior Social Security disability proceeding, as well as the RFC assessments of the consulting experts. The ALJ placed significant weight on the opinions of the agency consultants, who provided function-by-function assessments based upon the evidence as a whole. The ALJ concluded that the evidence collected since the last proceeding, combined with the opinions of the medical sources supported a reduction in ALJ Dummer's RFC finding. After having thoroughly reviewed and analyzed the relevant evidence, the ALJ made an RFC finding and fully explained the basis of the finding in a detailed discussion of the record. Therefore, the undersigned finds no error in the ALJ's RFC finding.

### B. Inconsistency in the RFC Discussion

For her second challenge, Claimant highlights an "internal inconsistency" between the RFC finding and the RFC discussion. In particular, the ALJ made a determination that Claimant could perform a reduced range of medium exertional work. (Tr. at 19). However, at the same time, the ALJ stated in the discussion that she had reviewed ALJ's Dummer's RFC finding and felt "that additional evidence submitted since the last decision provides a basis to warrant further reduction and accordingly; has not fully adopted the prior findings." (Tr. at 21). The ALJ added that "[s]ignificant weight has been afforded the prior assessments and opinions of the non-examining State agency physicians, Dr. Rabah Boukehemis and Pedro Lo. Restriction

to a reduced range of *light work* as set forth appears reasonable and well supported." (*Id.*). Claimant stresses the confusion created by the two apparently inconsistent findings and asks: "At any rate, did the Administrative Law Judge limit Plaintiff to medium or light work?"

Obviously, the ALJ did misspeak at one point in the decision, or at the other. However, a review of the decision and related evidence strongly suggests that the ALJ intended to find Claimant capable of a reduced range of medium work, and the reference to "light" work was a clerical error. Not only did the ALJ write the RFC finding for medium work, but she asked the vocational expert to assume a reduced range of medium level work in the controlling hypothetical question. Furthermore, although ALJ Dummer's prior decision likewise found Claimant capable of a reduced range of medium level exertional work, their RFC findings are not the same. As the ALJ indicates, her RFC finding does constitute a "further reduction" of the occupational base when compared with ALJ Dummer's RFC finding. In this case, the ALJ concluded that Claimant should **never** climb ladders, ropes, or scaffolds; could only **occasionally** crawl, and had additional limitations associated with her mental impairments. In contrast, ALJ Dummer found that Claimant was limited to **occasional** climbing of ladders, ropes, and scaffolds; **frequent** crawling; and she had **no** limitations related to her mental impairments. (Tr. at 19, 73). As such, although both ALJs found Claimant's maximum exertional level to be medium, ALJ Dummer's finding included less limitation than the current RFC finding.

Lastly, the ALJ explicitly gave significant weight to the physical RFC findings of Dr. Boukhemis and Dr. Lo, who both expressly concluded that Claimant was capable of medium level exertional work with additional nonexertional limitations. (Tr. at 21,

91, 106). Had the ALJ intended to find Claimant capable of only light level exertional work, she would not have afforded significant weight to those opinions. Accordingly, the record, the written decision, and the transcript of the administrative hearing all indicate that the ALJ intended the RFC finding to include an exertional level of medium, and the reference to light level work was a typographical error.

Nonetheless, any error in the RFC discussion is harmless, because the vocational expert found work that Claimant was capable of doing work at the medium, light, and sedentary exertional levels, even when assuming the additional nonexertional limitations set forth in the RFC finding. Courts have applied a harmless error analysis to administrative decisions that do not fully comport with the procedural requirements of the agency's regulations, but for which remand "would be merely a waste of time and money." *Jenkins v. Astrue,* 2009 WL 1010870 at *4 (D. Kan. Apr. 14, 2009) (citing *Kerner v. Celebrezze,* 340 F.2d 736, 740 (2nd Cir. 1965)). In general, remand of a procedurally deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission,* 721 F.2d 1054, 1056 (6th Cir. 1983). "[P]rocedural improprieties alleged by [a claimant] will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). The Fourth Circuit has similarly applied the harmless error analysis in the context of Social Security disability determinations. *See Morgan v. Barnhart,* 142 Fed. Appx. 716, 722–23 (4th Cir. 2005) (unpublished); *Bishop v. Barnhart,* 78 Fed. Appx. 265, 268 (4th Cir. 2003) (unpublished). In this case, the testimony of the vocational expert, coupled with the

written decision, provide substantial support for the conclusion that Claimant is not disabled regardless of whether she is limited to a reduced range of medium work or a reduced range of light work. Therefore, the Commissioner's disability determination should be affirmed.

## VIII. <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Therefore, the Court **DENIES** Plaintiff's motion for judgment on the pleadings, **GRANTS** Defendant's request that the Commissioner's decision be affirmed, and **DISMISSES** this action from the docket of the Court. A Judgment Order shall be entered accordingly.

The Clerk of this Court is directed to transmit copies of this Memorandum Opinion to counsel of record.

**ENTERED:** May 22, 2017

Cheryl A. Eifert
United States Magistrate Judge